# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

FILED IN OPEN COURT
DATE: 8|5|05
TIME: 8:55 AM
INITIALS: JPW

| | |
|---|---|
| RICKY D. ADAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Docket No. 03-2155 Ml/A |
| | ) |
| CITY OF MEMPHIS, TENNESSEE, | ) |
| | ) |
| Defendant. | ) |

## PROPOSED JOINT PRETRIAL ORDER REVISED

**COME NOW** the Plaintiff, Ricky D. Adams ("Plaintiff"), and Defendant, City of Memphis, Tennessee ("Defendant"), by and through their counsel of record, and submit the following revised Proposed Joint Pretrial Order:

## I.   JURISDICTION:

The basis for jurisdiction is not questioned.

## II.   PENDING MOTIONS:

Defendant's Rule 26(a)(3) Pre-trial Disclosure Objections is pending. Also, Defendant's Motion in Limine and/or Motion to Exclude Plaintiff's Color Vision Expert is pending.

## III.   STATEMENT OF THE CASE:

This case is at issue for trial on claims of discrimination pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* Plaintiff contends that Defendant refused to hire him for an entry level firefighter/paramedic position because Defendant regarded him as disabled by virtue of his color vision deficiency. Defendant contends that Plaintiff was not regarded

This document entered on the docket sheet in compliance with Rule 58 and/or 79(a) FRCP on  8-8-05

122

as disabled but that Plaintiff was not hired because he failed to complete the pre-medical screening examination.

## IV.   CONTENTION OF THE PARTIES

A.    Plaintiff's Contentions:

Plaintiff has a genetic color vision deficiency. However, this condition, about which he has known since childhood, has not disabled Plaintiff from serving as a paramedic in the U. S. Navy, working as a licensed paramedic in civilian life, driving an ambulance safely at high speed, passing a hazardous materials recognition course, passing a firefighter training course and earning Fire Fighter I certification from the State of Missouri. Moreover, Plaintiff's color vision deficiency does not preclude Plaintiff from performing a firefighter's essential job tasks as listed by the National Fire Protection Association ("NFPA") or as identified by Defendant.

In July of 1999, Plaintiff applied to the City of Memphis/Fire Services Division for an entry level position as a firefighter/paramedic. Plaintiff furnished information and documentation about his work history, paramedic licensing, and firefighter-related training and certification for inclusion in his application file. Having passed a physical ability test, written test and background check, Plaintiff was offered a position with admission for training to the April, 2001 class of the Memphis Fire Academy. The offer was contingent upon his passing certain medical screening tests, including vision tests.

The vision requirements specified by Defendant in its Notice of Job Openings stated that candidates for the position of Fire Fighter/Paramedic-Probationary-Entry must have 20/125 distant visual acuity in each eye without correction, 20/20 binocular vision with correction, at least 20/40 near vision in each eye separately with or without correction, normal color vision and normal depth

perception.   Plaintiff easily passed the vision acuity and depth perception tests on April 26, 2001. However, because of his  genetic color vision deficiency, Plaintiff failed the color vision test. Defendant's documentation of the screening tests identified  "color blindness" as the reason for Plaintiff's failure.

To test color vision, Defendant administers the Ishihari color plates test to determine whether a candidate  has normal color vision.  Defendant maintains that normal color vision is necessary for the performance of a firefighter's essential job functions because the position requires that a person be able to recognize such things as, but not limited to, color of traffic signals and warning labels on hazardous materials.  According to Defendant, good color vision is needed so that the firefighter can function in a smoke filled environment and safely wear a self-contained breathing apparatus. Defendant also claims that  normal  color  vision  is  required  because  on  a  daily  basis firefighters/paramedics need to discriminate colors as they drive through public streets, recognize and read warnings on hazardous materials, and read instrumentation.  Defendant's attempts to explain or justify its color vision standard reveal that Defendant believed that individuals like Plaintiff, who have a color vision deficiency, have a physical impairment that substantially  limits their major life activity of seeing, when, in fact, the impairment is hardly so  limiting.   Because he failed the color vision test, Plaintiff was not allowed to progress in the medical screening process and  was rejected for hired by Defendant as firefighter/paramedic.

Based on these facts,  Plaintiff contends that he was unlawfully denied employment as a firefighter/paramedic in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., because Defendant regarded him as disabled due to his color vision deficiency. Plaintiff also contends that his color vision deficiency does not preclude him from performing the

essential job tasks of a firefighter/paramedic and that the nationally recognized standards of the National Fire Protection Association ("NFPA") do not list color vision deficiency as a condition that prevents a person from performing fire-fighting operations. Accordingly, Plaintiff also maintains that Defendant's "normal color vision" requirement for firefighters constitutes unlawful discrimination under the ADA because application of the standard resulted in his disqualification, even though the standard cannot be justified by business necessity. 42 U.S.C. § 12112(b)(6).

Additionally or alternatively, Plaintiff maintains that Defendant's utilization of the Ishahari color plates to test color vision also constitutes discrimination under the ADA because, in violation of 42 U.S.C. § 12112(b)(7), the test does not effectuate the purpose of identifying patients with monochromatic vision. During the course of this litigation, Defendant has wavered, contending at times that it really does not require firefighters/paramedics to have normal color vision. Rather, with this shift in position, the only disqualifying color vision deficiency is monochromatic vision. Since individuals with monochromatic vision are limited to very blurred sight in shades of black and white and have no better that 20/200 vision, testing for visual acuity in accordance with NFTA standards would be sufficient.

Defendant contends that Plaintiff was not hired because he failed to avail himself of an opportunity to get a second opinion. According to Defendant, if an applicant does not pass the color vision test, the applicant is required to see a specialist to determine the type of color vision deficiency involved. The applicant must then return to the medical screening process with a diagnosis before further testing can be completed. If the color vision deficiency can be corrected with proper lenses, then the applicant is allowed to progress in the selection process. However, no applicant is allowed to progress if he or she fails the color vision test and does not follow this

procedure.  Defendant claims that Plaintiff's failure to follow this procedure made  him ineligible

to progress in the selection process.

Plaintiff contends that the first notice  he received of any such procedure came by a letter

from Defendant dated June 5, 2001, more than a month after he failed the color vision test and was

told to go home to Missouri.  In pertinent part, the letter stated as follows:

> The purpose of this correspondence is to confirm the reason that you did not
> progress in the selection process for Fire Recruit/Paramedic Firefighter-Probationary
> with the City of Memphis.
>
> As you are aware, the results of you [sic] pre-employment medical examination
> indicated that you failed the color vision test.
>
> If your medical condition is treatable/correctable, and you have sought medical
> attention for this condition, please provide documentation from your physician as to
> the outcome or prognosis.

Plaintiff did not seek a second opinion; nor did he obtain corrective lenses for his color vision

deficiency.  According to Plaintiff, Defendant's suggestion that he provide documentation from his

physician was little more than an invitation to engage in a futile exercise because his color vision

deficiency is neither treatable nor correctable.  Defendant's suggestion was also disingenuous

because by the time Plaintiff had received the letter, candidates for the April, 2001 who had passed

the medical exam had already been notified, hired and engaged in training for over a month.

Moreover, Plaintiff maintains that Defendant's purported screening procedure, as applied to him,

was, at bottom,  gratuitous because his good vision acuity, reinforced by his work history,  was

sufficient to establish that he does not have monochromatic vision – the severe (and rare) color

vision deficiency that would preclude him from performing as a firefighter.  Defendant knew, or

certainly should have known, that Plaintiff did not have monochromatic vision. Accordingly,

Defendants purported non-discriminatory reason for not hiring Plaintiff for a firefighter/paramedic position is a mere pretext.

The amounts of Plaintiff's ascertainable damages are listed in another subsection below.

B.     Defendant's Contentions:

Defendant did not regard Plaintiff as having an impairment that substantially limits a major life activity.  Moreover, Defendant did not regard Plaintiff's non-limiting color vision condition as a condition that substantially limits a major life activity.  In fact, Defendant did not know any specific details regarding Plaintiff's color vision other than the fact that he did not pass the screening test.  As such, Defendant did not have enough information regarding Plaintiff's condition to formulate an opinion that a major life activity was substantially limited.

On or about July 27, 1999, Plaintiff applied for a position as firefighter/paramedic with Defendant.  After his contingent offer of employment, Plaintiff was given a medical screening examination on or about April 25, 2001.  During his screening, Plaintiff failed the blood pressure screening.  He informed Dr. Merigian, the doctor that facilitated the medical screening, of his hypertension and that he had not taken his medication.  Plaintiff was asked to return the following day after taking his medication to be re-tested and to complete the screening tests.  Plaintiff followed Dr. Merigian's instruction and his hypertension was found to be controlled by his medication.  The remainder of the pre-medical screening resumed.

Thereafter, Dr. Merigian administered the Ishihara Test to Plaintiff.  The Ishihara Test is a screening test that indicates whether a color vision deficit is present.  This test does not discriminate the type or degree of the color deficiency present.  Plaintiff did not pass the test for color vision and was asked to obtain a second opinion from a specialist of his choice regarding his condition.

Plaintiff was reminded of the need for further testing in a letter sent to him dated June 5, 2001 by Rose Echols, an employee with Defendant. Plaintiff never returned with a second opinion and Plaintiff never contacted Mrs. Echols after receiving such letter.

Defendant's April 2001 class of Firefighter/Paramedics began training on or about April 23, 2001. Before training with Defendant as a Firefighter/Paramedic, a candidate for such position must have a valid Paramedic License with the State of Tennessee. Plaintiff was scheduled to take his medical screening examination close to the date training began because his Tennessee Paramedic License was not issued until April 19, 2001. If Plaintiff had complied with Dr. Merigian's instructions regarding the need for further color vision testing, he would have completed the medical screening process in time to train with the April 2001 class. Moreover, if Plaintiff had contacted Mrs. Echols after receiving her June 5, 2001 letter and submitted additional information regarding his color vision condition, he could have been included in the November 2001 class of Firefighter/Paramedics. Instead, Plaintiff chose to abandon the medical screening process and leaving Defendant without definitive information about his color vision.

## V.   STATEMENT OF UNCONTESTED FACTS

1.     Plaintiff submitted an application and personal history statement for a job as Firefighter/Paramedic with Defendant dated July 27, 1999.

2.     Plaintiff's application was submitted in response to Defendant's Notice of Job Openings ("Notice"). (Bates stamp No. 001)

3.     The minimum qualifications for the position listed in the Notice included "normal color vision."

4.      Plaintiff's application file with Defendant contained information indicating that Plaintiff worked as a licensed paramedic in civilian life beginning 1996, passed a Hazardous Materials Awareness Level course in 1999, passed a firefighter training course in 1999, and earned Fire Fighter I certification from the State of Missouri in 1999.

5.      On or about December 29, 2000, Plaintiff progressed to the next step in the selection process and was placed on the Eligible Register for consideration for the position of Fire Recruit as openings occur.

6.      After passing a physical ability test, a written psychological test and a background check, Plaintiff was offered an entry level firefighter/paramedic position and admission to the April, 2001 Memphis Fire Academy for training. The offer was contingent upon the Plaintiff passing his medical screening tests, including various vision tests.

7.      On or about April 19, 2001, Plaintiff received his Paramedic License for the State of Tennessee.

8.      On or about April 25, 2001, Plaintiff filled out and submitted the Fire Applicant Medical History Statement and the OSHA Respirator Medical Evaluation Questionnaire.

9.      On or about April 26, 2001, Plaintiff passed the vision acuity and depth perception tests, but failed the Ishihara color vision test.

10.   The Ishihara test is a color vision screening test to determine whether a candidate has normal color vision.  It does not measure any specific details about color vision deficiencies.

11.   By letter dated June 5, 2001, Defendant confirmed that Plaintiff failed the color vision test.

12.   This letter was a form letter.

13.   Plaintiff did not return to the medical screening process with glasses or contact lenses to be reassessed.

14.   Plaintiff did not return to the medical screening process with documentation from a specialist regarding his condition.

15.   Defendant's medical standards lists normal color vision among conditions that are usually acceptable for placement in the job of firefighter/paramedic.  However, such medical standards also state that an individual medical determination may be made with documented input from the treating physician and/or appropriate medical specialist.

16.   Defendant's medical standards were changed in 1999.

17.   The application packet lists the minimum qualifications and essential job functions of a firefighter/paramedic for Defendant.

18.   Plaintiff resigned from the City of Raytown on or about November 29, 2002.

19.   Plaintiff began employment with his current employer, Rev. Noel T. Adams Memorial Ambulance District ("NTA"), on February 19, 2003.

20.    According to Pokorny (1979), about 4.5% of the population experience various color vision deficiencies; 8% of those affected are males. The balance of the population, 95.5%, enjoys normal color vision.

21.    According to Pokorny (1979), the incidence of rod monochromacy in the male population is .003% and .002% in the female population.  The incidence of cone monochromacy in the male population is .000001, or one in one hundred million people. The incidence of cone monochromacy in the female population is the same.

22.    The National Fire Protection Association ("NFPA") Section 1582 is a nationally recognized Standard on Medical Requirements for Firefighters. (NFPA 1582 – 2000 Edition, p.1582-1).

23.    Two categories of medical conditions were created by the NFPA, Category A and Category B.  Category A represents conditions that, if they exist in the candidate or current fire fighter, would not allow this person to perform fire-fighting operations. Category B conditions must be evaluated on a case-by-case basis so that the fire department physician can determine if the medical condition in a particular candidate or current fire fighter would prevent that person from performing fire-fighting operations. (Id.).

24.    Extensive advisory and information material was developed in the appendixes of NFPA 1582 to aid fire department administrators and fire department physicians. In the corresponding Appendix A explanatory material to NFPA 1582, a diagnostic example is often included with the list.  In addition, the rationale for the rejection is presented in terms of the effect of the medical condition on the capability of the

person to perform as a member. Such Appendix to NFPA 1582 is not a part of the requirements thereof but is included for informational purposes only.

25.    The 2000 Edition of NFPA 1582 did not list color vision deficiency as either a Category A or Category B medical condition. (Id., sections 3-3.1 & 3-3.2, p. 1582-8). The following observation appears in an explanatory note in Appendix A to the 2000 Edition:

(a)    Any other eye condition that results in a person not being able to perform as a member. Persons with severe color vision loss will likely fail the acuity requirement.

Formerly, color vision deficiency was listed as a Category B medical condition. However, it is felt that within most cases this condition will not affect the ability of a fire fighter to perform the essential functions of his or her job. The fire service physician should consider the color vision deficiency of the individual and consider the color vision requirements of the fire fighter's job and reach an individual determination.

## VI.    STATEMENT OF CONTESTED ISSUES OF FACTS

A.    Plaintiff:

1.    Whether Defendant knew or should have known that Plaintiff could see clearly?

2.    Whether Defendant knew or should have known that Plaintiff was not color blind or monochromatic?

3.    Whether Defendant treated Plaintiff as though he was color blind or monochromatic?

4.      Whether Defendant informed Plaintiff at any time before June, 2001 that he could or should get a second opinion from a specialist about his color vision deficiency?

5.      Whether Defendant knew or certainly should have known that Plaintiff is able to wear and use self-contained breathing apparatus?

6.      Whether Defendant informed Plaintiff before, during or soon after the screening procedure that with a red filter lens he should be able to pass the Ishihari color vision test?

7.      Whether the Ishihari test is an effective or practical devise to determine whether an applicant for a firefighter/paramedic position is monochromatic?

8.      Whether affordable and feasible alternatives to the Ishahari test are available to determine whether an applicant for a firefighter/paramedic position is monochromatic?

9.      Whether Plaintiff's color vision deficiency is treatable or correctable?

10.     Whether Plaintiff's resignation in November, 2002, from his position as a paramedic for the City of Raytown was reasonable under the circumstances.?

11.     Whether Plaintiff made a reasonable effort to find alternative employment after he left his employment at Raytown?

B.      Defendant:

1.      Whether Plaintiff would have progressed in the selection process if he would have returned to the pre-medical screening process.

2.      Whether Plaintiff's condition is treatable or correctable?

3.     Whether Plaintiff is entitled to the monetary damages as calculated by Parker Cashdollar, Ph.D?

4.     Whether Plaintiff is otherwise qualified for the position of firefighter/paramedic with Defendant?

5.     On or about April 25, 2001, Plaintiff failed the blood pressure screening due to his hypertension. Plaintiff informed Dr. Merigian that he had not taken his hypertension medicine. He was instructed to return the following day after taking his medication. Upon his return, Plaintiff's blood pressure was re-tested and found to be controlled by his medication. Plaintiff's medical screening examination resumed.

6.     On or about April 26, 2001, Plaintiff was informed by Dr. Merigian that he did not pass the Ishihara test for color vision and that a second opinion was needed to understand his color vision condition.

7.     Applicants that do not pass the color vision screening test are required to seek a specialist of their choosing to determine the type and/or extent of color vision deficiency involved.

8.     The applicant must then return to the medical screening process with a diagnosis by a specialist before further testing can be completed.

9.     No applicant is allowed to progress in the selection process until the aforementioned procedure is followed or justification is received for their inability to do so.

10.     On or about April 26 2001, Plaintiff and Dr. Merigian discussed Dr. Merigian's belief that certain lenses could correct or treat color vision deficiencies and Plaintiff's possible need for such lenses.

11.     On or about April 26, 2001, Plaintiff was asked by Dr. Merigian to seek a specialist to determine the type of color vision deficiency involved and to return to be reassessed with either a lense or documentation from the specialist as to his condition.

12.     Plaintiff did not obtain a second opinion regarding his color vision after his screening with Dr. Merigian.

13.     Plaintiff did not seek a second opinion regarding his color vision after his screening with Dr. Merigian.

14.     Plaintiff did not file his first complaint with the Equal Employment Opportunity Commission ("EEOC") until approximately July 27, 2001, almost two months after receiving the letter from Rose Echols dated June 5, 2001.

15.     Plaintiff was not tested for color vision by a specialist until on or about October 13, 2003.

16.     Defendant's medical standards do not state that the color vision condition has to be treatable or correctable in order to be acceptable for employment with Defendant in the position of firefighter/paramedic.

17.    After his training with Raytown Fire Protection District, Plaintiff passed the State of Missouri's Certification test for Firefighter I but failed the certification test for Firefighter II..

18.    During his training with Raytown Fire Protection District, Plaintiff passed the Hazardous Materials Incident Response - Awareness class but did take the class for Hazardous Materials Incident Response - Operations.

19.    Plaintiff was never a firefighter or reserve firefighter for Raytown Fire Protection District.

20.    Arguably, a red/green color vision deficit can be treated.

21.    The City of Raytown gave a 5.5% increase to its employees in 2005.

22.    As of June 1, 2002, Plaintiff was 100% vested in his pension benefit with the City of Raytown, Missouri.  His monthly benefit was estimated to be $185.00.

23.    Whether Defendant regarded Plaintiff as disabled?

## VII.    CONTESTED ISSUES OF LAW

1.    Whether the Plaintiff can establish that Defendant regarded him as disabled under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq?*

2.    Assuming Plaintiff establishes that Defendant regarded him as disabled, does Defendant's utilization of the "normal color vision" requirement for firefighters/paramedics constitute direct evidence of unlawful discrimination under the ADA, 42 U.S.C. § 12112(b)(6), such that Defendant bears the burden of proving that normal color vision is job related and consistent with business necessity?

3.   Whether Defendant has articulated a legitimate non-discriminatory reason for not hiring Plaintiff?

4.   Whether Defendant's proffered reason is legitimate or a mere pretext to conceal discriminatory intent?

5.   Whether Plaintiff is entitled to recover back pay, front pay, and lost pension benefits, assuming Plaintiff prevails on the liability issue?   If so, in what amounts?

6.   Whether Plaintiff mitigated his damages?

7.   Whether Plaintiff is entitled to declaratory relief to the effect that Defendant's "normal color vision" requirement for firefighters/paramedics constitutes unlawful discrimination under the ADA?

8.   Whether Plaintiff is entitled to a mandatory injunction directing Defendant to eliminate its "normal color vision" requirement for firefighters/paramedics?

Note:   Defendant does not agree that this item is a triable issue because it is not plead in the Second Amended Complaint and Defendant has not otherwise had notice that such injunction was being sought by Plaintiff.

9.   Assuming Plaintiff prevails on all or some issues, is Plaintiff entitled to an award of attorney fees, litigation expenses and pre-judgment interest? If so, in what amounts?

10.   Whether Defendant's utilization of the Ishihari color plates to test color vision constitutes unlawful discrimination under 42 U.S.C. § 12112(b)(7)?

11.   Whether Plaintiff can state a *prima facie* case of discrimination based upon the ADA?

12.    Whether Plaintiff can show a pretext with regard to Defendant's articulated and non-discriminatory reason for Plaintiff's failure to progress in the selection process?

13.    Whether Plaintiff's back pay damages, if any, should be off-set by the time he did not work after he resigned from the City of Raytown and before he began working with NTA?

14.    Whether Plaintiff failed to mitigate his damages when he resigned from the City of Raytown?

16.    Whether Plaintiff's front pay and back pay damages, if any, are to be calculated using his wages at the City of Raytown or NTA.

17.    Whether Plaintiff is otherwise qualified for a firefighter/paramedic position with Defendant?

18.    Whether Plaintiff should be placed in a firefighter/paramedic position without loss of seniority and service credit?

19.    Whether Plaintiff's lawsuit is frivolous, unreasonable and groundless, and accordingly, Defendant is entitled to attorney's fees and other costs associated with the defense of this action?

20.    Whether Plaintiff is disabled within the meaning of the ADA?

21.    Whether it would be an undue hardship for Defendant to accommodate Plaintiff?

22.    Whether Plaintiff's color vision deficiency poses a direct threat to the health and safety of himself, others, and the public?

23.    Whether Defendant is liable for acts of its employees and/or agents that were performed outside the scope of their employment.

24.     The admissibility of exhibits and/or testimony challenged by the parties' objections.

## VIII.    LIST OF EXHIBITS

The following is a list and brief description of exhibits (excluding exhibits for impeachment) the respective parties may offer at trial.

A.     Documents Plaintiff is expected to offer as exhibits:

1.     Six page letter dated March 6, 2002 from Myra Watkins, J.D., EEO/Labor Relations Specialist for City of Memphis to Cle Arthur Morris, Supervisor, EEOC (Exhibit 1 to Deposition of Myra Watkins, taken April 30, 2004).

2.     Watkins' Adams file (Collective Exhibit 2 to Deposition of Myra Watkins taken April 30, 2004).

3.     Three page letter dated February 7, 2002 from Kevin S. Merigian, M.D. to Myra Watkins (Exhibit 3 to Deposition of Myra Watkins taken April 30, 2004 and Exhibit 3 to Deposition of Dr. Kevin Sam Merigian taken May 6, 2004.

4.     City of Memphis Firefighter/Paramedic Probationary job description, revised 5/28/99, including statement of essential job functions and minimum qualifications (Exhibit 2 to Deposition of Dr. Kevin Sam Merigian and Exhibit 11 to Parties' Stipulation as to Authenticity and Admissibility for Purposes of Summary Judgment of Documents Prepared and/or Produced by City (hereinafter "Parties' Stipulation").

5.     One page letter dated June 5, 2005 to Ricky D. Adams from Rose Echols, Employment Analyst, City of Memphis (Exhibit 12 to Parties' Stipulation;

Exhibit 15 to Deposition of Rose Echols taken May 25, 2004; Exhibit 6 to Deposition of Ricky Adams taken May 4, 2004).

6.    City of Memphis / Pre-Medical Screening of Ricky Adams –results of vision tests (Exhibit 5 to Deposition of Dr. Kevin Sam Merigian).

7.    Minimum Medical Standards for Police Recruits, Firefighter/Paramedics and Police Service Technicians (PST) – Eyes and Vision (Exhibit 9 to Deposition of Dr. Kevin Merigian).

8.    Ricky D. Adams' Fire/Police Applicant Medical History Statement (included in Exhibit 10 to Deposition of Dr. Kevin Merigian.)

9.    All medical records pertaining to Ricky Adams in Dr. Kevin Merigian's possession  (produced by City of Memphis as Exhibit 1 to Defendant's Responses to Plaintiff's Fourth Request for Production of Documents, Response to Request No. 1).

10.    To the extent not specifically identified under Part C of Plaintiff's Rule 26(a)(3) Pretrial Disclosures, all Exhibits to the Deposition of Dr. Kevin Merigian).

11.    Medical Standards for Fire, Police & General Employees/City of Memphis (Exhibit 1 to Parties' Stipulation).

12.    State of Tennessee/Division of Emergency Medical Service/Medical Statement for Emergency Medical Services Professional License (Exhibit 2 to Parties' Stipulation).

13.     Personal History Statement dated July 27, 1999 submitted by Ricky D. Adams to Memphis Fire Services Division and attachments (27 pages) (Exhibit 5 to Parties' Stipulations).

14.     Basic Firemanship Training Format / Memphis Fire Training (Exhibit 6 to Parties' Stipulations).

15.     Application for Employment submitted by Ricky Darnell Adams to City of Memphis for Firefighter/Paramedic position. (Exhibit 6 to Parties' Stipulations).

16.     Notice of Job Opening for Position of Fire Fighter/Paramedic - Probationary - Entry, including statement of minimum qualifications, posted by City of Memphis from June 9, 1999 to July 9, 1999. (Exhibit 8 to Parties' Stipulations).

17.     Notice of Job Opening for Position of Fire Fighter/Paramedic  Probationary - Entry, including statement of minimum qualifications, posted by City of Memphis from March 13, 2002 to April 1, 2002. (Exhibit 9 to Parties' Stipulations).

18.     Three (3) pages from the [Memphis] Division of Fire Services Operations Manual listing the job responsibilities of a Fire/Fighter Paramedic (Exhibit 12 to Parties' Stipulations).

19.     To the extent not specifically identified under  Part C of Plaintiff's Rule 26(a)(3) Pretrial Disclosures, all Exhibits contained in the Parties' Stipulation.

20.  National Fire Protection Association ("NFPA") 1582 – 1997 ed., various pages.

21.  National Fire Protection Association ("NFPA") 1582 – 2000 ed., various pages.

22.  National Fire Protection Association ("NFPA") 1582 – 2003 ed., various pages.

23.  One page letter dated July 22, 1999 to Whom it May Concern from J. Bruce Vanderhoof, Battalion Chief, Raytown Fire Protection District, confirming Adams' completion of the Missouri Division of Fire Safety Firefighter I/II certification course (Exhibit 1 to Declaration of Ricky Adams).

24.  Hazardous Materials Awarenesss Level certification of Ricky D. Adams issued by Missouri Department of Public Safety / Missouri Division of Fire Safety (Exhibit 3 to Declaration of Ricky Adams).

25.  One page letter dated December 29, 2000 from Rose L. Echols, City of Memphis/Employment Service Center to Ricky D. Adams (Exhibit 8 to Declaration of Ricky Adams).

26.  Exhibit 1 to Supplemented Declaration of Ricky Adams.

27.  To the extent not specifically identified under  Part C of Plaintiff's Rule 26(a)(3) Pretrial Disclosures, all Exhibits to the Deposition of Richard C. Wilson, O.D.

28.  Ricky D. Adams federal income tax returns for 2000, 2001, 2002, 2003 and 2004.

29.     Ricky Adams paycheck stub from NTA (Exhibit 13 to Deposition of Ricky D. Adams taken May 4, 2004).

30.     To the extent not specifically identified under Part C of Plaintiff's Rule 26(a)(3) Pretrial Disclosures, all exhibits to the Deposition of Parker Cashdollar, Ph.D. , taken December 22, 2004.

31.     Exhibits 1 and 2 to the Supplemental Declaration of Richard C. Wilson, O.D.

32.     City of Memphis/computer printout listing deductions and earnings for tax years 2001, 2002 and 2003   of firefighters/paramedics admitted to the Memphis Fire Academy class of April, 2001 (produced by City of Memphis as Exhibits 12, 13 and 14 to Defendant's Response to Plaintiff's First Set of Interrogatories to Defendant City of Memphis/Fire Department, Defendant's answer to Interrogatory No. 12; Exhibits 1, 2 and 3 to the Deposition of Betty Swinney).

33.     Dr. Parker Cashdollar's "Economic Loss Report as Revised and Amended on 5/4/05" and all attachments thereto.

34.     All responses to written discovery submitted by Defendant.

B.     Documents Defendant may offer as exhibits:

| Description | Bates Stamped |
| --- | --- |
| 1999 Application Packet for Fire Recruits | 000001 - 17 |
| Firefighter/Paramedic Regulation | 000018 - 20 |
| Letter from Dr. Merigian dated 2/7/2002 | 000021 - 23 |
| Defendant's Medical Standards | 000024 - 36 |

| | |
|---|---|
| List of April 2001 Class of Firefighter/Paramedics | 000037 - 39 |
| Letter from Rose Echols dated 12/9/00 | 000040 |
| Fax and attachment to Ms. Echols dated 4/20/01 | 000041 - 42 |
| Fax cover page from Ms. Echols dated 4/24/01 | 000043 |
| Letter from Ms. Echols to Plaintiff re: Medical Screening | 000044 - 45 |
| Letter from Ms. Echols to Plaintiff dated 6/5/01 | 000046 |
| Plaintiff's Medical Records from Richard Wilson, O.D. | 000047 - 61 |
| Plaintiff's Medical Records from Pre-Medical Screening | 000062 - 95 |
| Plaintiff's Employment Application with Defendant | 000096 - 101 |
| Plaintiff's Personal History Statement | 000102 - 122 |

C.    Defendant may also offer as exhibits:

| Description | Bates Stamped |
|---|---|
| Plaintiff's Employment Records from the City of Raytown | 000123 - 141 |
| Letter from Chief Rick Mawhirter dated 1/13/05 | 000142 - 143 |
| Letter from Art Maxwell of NTA Ambulance District | 000144 - 145 |
| NFPA 1582 - 2003 Edition | |
| NFPA 1582 - 2000 Edition | |
| NFPA 1582 - 1997 Edition | |
| Supplemented Declaration of Plaintiff, Exhibit 1 only | |
| To the extent not listed, all Exhibits to all depositions taken | |
| All Responses and Exhibits to written discovery submitted by the parties | |

Expert Report of Richard Wilson, O.D. (To the extent expert and/or testimony not excluded)

Expert Reports of Parker Cashdollar

Expert Report of Scott Steinman, O.D., Ph.D., F.A.A.O.

Plaintiff paycheck stub from NTA

Plaintiff's Federal Income tax returns for 2000 through 2004

EEOC Records and/or Documents

Any and all depositions taken in the case

Any and all of Plaintiff's Exhibits

Any and all exhibits needed for impeachment, rebuttal or rehabilitation of witnesses

D.     Stipulations:

Except as otherwise indicated, the authenticity of exhibits has been stipulated by the parties and they have been received subject to objections, if any, by opposing party at trial as to their relevance and materiality.  (Except for expert reports. To the extent not excluded)

In the event that either party identifies any other exhibits they may wish to introduce at trial, a copy of same will be provided to opposing counsel at least ten (10) days prior to trial.  Both parties agree that any such additional exhibits may be admitted at trial only upon leave of Court.

The parties agree that all documents produced through discovery either by the Defendant or the Plaintiff are authentic and no objections will be made to their admissibility except on the basis of relevancy.  However, Defendant reserves its objections as to whether Dr. Wilson's expert report should be admitted for the reasons set forth in Defendant's Motion in Limine and/or Motion to Exclude Plaintiff's Expert.

The parties agree that all personal information of third parties, such as names, addresses, social security numbers of current Defendant's firefighter/paramedics, shall be redacted before any exhibit is entered with the Court.

The parties agree that all documents produced by third parties, specifically the EEOC, NFPA, Dr. Merigian's Office, and the office of Richard Wilson, O.D. are authentic and no objection will be made to their admissibility except on the basis of relevancy.

By signing this Pretrial Order, neither party waives any objections they may have to any of the Exhibits listed by the other party.

## IX. WITNESSES

A.    Witnesses Plaintiff will present:

1.    Ricky D. Adams
      8106 Elm
      Raytown, MO 64138
      816-835-9800 (cell)

2.    Parker Cashdollar, Ph.D.
      919 Dean Drive
      Dyersburg, TN 38024
      731-285-2320

Note:  Dr. Parker is a professor of economics at the University of Tennessee and has been retained by Plaintiff to testify under Rule 702 as an expert on the dollar value of Plaintiff's back pay loss, front pay loss and past and future lost benefits.

3.    Richard C. Wilson, O.D.
      Advanced Eye Care
      6708 Raytown Road
      Raytown, MO 64133
      816-806-5552

Note:  Dr. Richard C. Wilson is Plaintiff's treating optometrist. He will testify about the results of his examinations of Plaintiff's vision, including Plaintiff's genetic color vision deficiency. He will also testify as an expert under Rule 702 on the types of color vision deficiencies, on the issue whether Plaintiff's color vision deficiency is treatable and/or correctable, on the

sufficiency of the results of the tests of Plaintiff's vision acuity for determining that Plaintiff is not a rod monochromat, on the incidence of various types of color vision deficiencies in the general population, on the generally accepted definition of "normal color vision" in the optometric profession, on tests used to ascertain whether a patient has a color vision deficiency, on Plaintiff's ability to perform the essential functions of the job of firefighter/paramedic as listed by Defendant, on the availability of more efficacious tests or procedures to screen out persons with severe color vision deficiencies, and about the changes in thinking among vision specialists about the ability of most persons with color vision deficiencies to perform fire-fighting operations.

Witnesses Plaintiff may present if the need arises:

1.   Kevin Sam Merigian, M.D.
     The Stone Institute, Inc.
     8200 Old Dexter Road, Suite 103
     Cordova, TN 38016, STE 103
     901-757-4646

2.   Scott Steinman, O.D., Ph.D.
     Department of Biomedical Sciences
     Southern College of Optometry
     1245 Madison Avenue
     Memphis, TN 38104-2222
     901-722-3381

3.   Myra Ann Watkins, J.D.
     ADA/FMLA Coordinator
     Division of Human Resources
     City of Memphis
     125 North Main Street, Room 406
     Memphis, TN 38103
     901-576-6435

4.   Rose Echols
     Employment Analyst
     Employment/Records Department
     Human Resources Division
     City of Memphis
     125 North Main Street, Room 1 B33
     Memphis, TN 38103
     901-576-6434

5.      Gwen Willingham
        Manager
        Employment/Records Department
        Human Resources Division
        City of Memphis
        125 North Main Street, Room 1B33
        Memphis, TN 38103
        901-576-6434

6.      Chester Anderson
        Fire Services Division
        City of Memphis
        65 South Front Street
        Memphis, TN 38103
        901-527-1400

7.      Betty Swinney
        Associate Accountant
        Payroll/Personnel Section
        Fire Services Division
        City of Memphis
        65 South Front Street
        Memphis, TN 38103
        901-320-5451

8.      Marilyn Pickens
        Human Resources Division
        Benefits/Pension
        City of Memphis
        City Hall
        125 N. Main Street
        Memphis, TN 38103
        901-576-6761

9.      John Barry O'Neill, Jr.
        Lieutenant
        Fire Services Division
        Training Bureau
        4341 O K Robertson Road
        Memphis, TN 38127
        901-354-6700

      10.     Stephen Fort
                 Firefighter/Paramedic
                 7463 Apple Yard Lane
                 Cordova, TN 38016
                 901-388-3185

      11.     Eric Sabbatini
                 Compensation
                 Human Resources Division
                 City of Memphis
                 City Hall
                 125 N. Main Street
                 Memphis, TN 38103
                 901- 576-6569

**B.**    Defendant expects to call the following witnesses to testify at trial either live, through their business records or via their deposition:

      1.     Scott Steinman, O.D., PhD, FAAO

**Note:**  Dr. Scott Steinman is a professor at the Southern College of Optometry here in Memphis, Tennessee. His expertise in the area of color vision is extensive. He will testify about the factual errors, mistakes and misstatements in Dr. Wilson's Expert Reports and in other testimony of Dr. Wilson. Dr. Steinman will also testify about the results of Dr. Wilson's examinations of Plaintiff's vision, including Plaintiff's color vision deficiency. In his testimony, Dr. Steinman will discuss color vision deficiencies in general, Plaintiff's color vision deficiency, whether visual acuity results can aid in the determination and/or diagnosis of whether an individual has a monochromatic color vision deficiency, the term "normal color vision"and whether normal color vision should be required for firefighters with some qualifications as stated in Defendant's medical standards, tests used to determine color vision deficiency, Plaintiff's ability to perform the essential functions of the job of firefighter/paramedic as listed by Defendant, the use of the Ishihara test or other color vision tests in Defendant's medical pre-screening process, which color vision deficiencies may be acceptable for a position of firefighter/paramedic with Defendant, NFPA standards, and the uses of lenses to treat and/or correct color vision deficiencies. Dr. Steinman's testimony will rebut all supposed facts, issues, conclusions and opinions given in Dr. Wilson's Reports and testimony.

      2.     Kevin Sam Merigian. M.D. (Medical Facilitator)

      3.     Rose Echols

Defendant may call the following witnesses at trial either live, through their business records or via their deposition:

1. Lt. Barry O'Neill

2. Eric Sabatini

3. Steve Fort

4. Gwen Willingham

5. Marilyn Pickens

6. Betty Swinney

7. Lee Thomas

8. Pearl Gibson

9. Terre Johnson

10. Myra Watkins

11. Dr. Parker Cashdollar (Plaintiff's economic expert)

12. Richard C. Wilson, O.D. (Plaintiff's treating physician and expert witness)

13. Ricky Adams

14. All individuals identified in Plaintiff and Defendant's Rule 26(a)(1) initial disclosures, and any supplements thereto.

15. All individuals listed on Plaintiff's Preliminary Witness List.

16. All individuals called as witnesses by Plaintiff at trial.

17. All individuals necessary to authenticate exhibits.

18. All individuals necessary for rebuttal, impeachment or rehabilitation.

In the event there are other witnesses to be called at the trial, their names and addresses and the general subject matter of their testimony will be reported to opposing counsel, with copy to the

Court, at least ten (10) days prior to trial.  Such witnesses may be called at trial only upon leave of Court.  This restriction shall not apply to rebuttal or impeachment witnesses.

By signing this proposed Pretrial Order, neither party waives any objections they may have to any of the witnesses listed by the other party and any rebuttal, impeachment or rehabilitation witnesses the other party attempts to call.

## X.   NON-JURY TRIAL

This case is a bench trial, and in accordance with the Court's Pretrial Procedures, the Parties shall submit proposed findings of fact and proposed conclusions of law no later than two business days prior to the beginning of trial.

A.      Plaintiff's proposed findings of fact and conclusions of law:

B.      Defendant's proposed findings of fact and conclusions of law:

1.      Plaintiff submitted an application and personal history statement for a job as Firefighter/Paramedic with Defendant dated July 27, 1999.

2.      On or about December 29, 2000, Plaintiff progressed to the next step in the selection process and was placed on the Eligible Register for consideration for the position of Fire Recruit as openings occur.

3.      On or about April 19, 2001, Plaintiff received his Paramedic License for the State of Tennessee.

4.      Thereafter, Plaintiff was made a conditional job offer contingent upon the Plaintiff passing the Pre-Medical Screening tests scheduled for April 25, 2001.

5.      On or about April 25, 2001, Plaintiff filled out and submitted the Fire Applicant Medical History Statement and the OSHA Respirator Medical Evaluation Questionnaire.

6.      On or about April 25, 2001, Plaintiff failed the blood pressure screening due to his hypertension. Plaintiff informed Dr. Merigian that he had not taken his hypertension medicine. He was instructed to return the following day after taking his medication. Upon his return, Plaintiff's blood pressure was re-tested and found to be controlled by his medication. Plaintiff's medical screening examination resumed.

7.      On or about April 26, 2001, Plaintiff was informed by Dr. Merigian that he did not pass the Ishihara test for color vision and that a second opinion was needed to understand his color vision condition.

8.      The Ishihara test is a color vision screening test that does not measure any specific details about color vision deficiencies other than to detect moderate color vision problems.

9.      Applicants that do not pass the color vision screening test are required to seek a specialist of their choosing to determine the type and/or extent of color vision deficiency involved.

10.     The applicant must then return to the medical screening process with a diagnosis by a specialist before further testing can be completed.

11.     No applicant is allowed to progress in the selection process until the aforementioned procedure is followed or justification is received for their inability to do so.

12.  On or about April 26 2001, Plaintiff and Dr. Merigian discussed Dr. Merigian's belief that certain lenses could correct or treat color vision deficiencies and Plaintiff's possible need for such lenses.

13.  On or about April 26, 2001, Plaintiff was asked by Dr. Merigian to seek a specialist to determine the type of color vision deficiency involved and to return to be reassessed with either a lense or documentation from the specialist as to his condition.

14.  Plaintiff did not return to the medical screening process with glasses or contact lenses to be reassessed.

15.  Plaintiff did not return to the medical screening process with documentation from a specialist regarding his condition.

16.  Plaintiff did not obtain a second opinion regarding his color vision after his screening with Dr. Merigian.

17.  Plaintiff did not seek a second opinion regarding his color vision after his screening with Dr. Merigian.

18.  On or about June 5, 2001, Plaintiff received a letter from Rose Echols informing him of the need for further information regarding his color vision. (Bates No. 046).

19.  This letter was a form letter.

20.  Plaintiff did not file his first complaint with the Equal Employment Opportunity Commission ("EEOC") until approximately July 27, 2001, almost two months after receiving the letter from Rose Echols dated June 5, 2001.

21. Plaintiff was not tested for color vision by a specialist until on or about October 13, 2003.

22. Defendant's medical standards lists normal color vision among conditions that are usually acceptable for placement in the job of firefighter/paramedic. However, such medical standards also state that an individual medical determination may be made with documented input from the treating physician and/or appropriate medical specialist.

23. Defendant's medical standards do not state that the color vision condition has to be treatable or correctable in order to be acceptable for employment with Defendant in the position of firefighter/paramedic.

24. Defendant's medical standards were changed in 1999.

25. The application packet lists the minimum qualifications and essential job functions of a firefighter/paramedic for Defendant.

26. After his training with Raytown Fire Protection District, Plaintiff passed the State of Missouri's Certification test for Firefighter I but failed the certification test for Firefighter II.

27. During his training with Raytown Fire Protection District, Plaintiff passed the Hazardous Materials Incident Response - Awareness class but did take the class for Hazardous Materials Incident Response - Operations.

28. Plaintiff was never a firefighter or reserve firefighter for Raytown Fire Protection District.

29. Arguably, a red/green color vision deficit can be treated.

30.   The City of Raytown gave a 5.5% increase to its employees in 2005.

31.   As of June 1, 2002, Plaintiff was 100% vested in his pension benefit with the City of Raytown, Missouri. His monthly benefit was estimated to be $185.00.

32.   Plaintiff voluntarily resigned from the City of Raytown on or about November 29, 2002.

33.   Plaintiff began employment with his current employer, Rev. Noel T. Adams Memorial Ambulance District ("NTA"), on February 19, 2003.

34.   Plaintiff did not pass the medical screening test because he did not complete his examination and not because he was regarded as disabled within the meaning of the ADA.

35.   Plaintiff's decision to abandon the medical screening process made him ineligible to progress in the selection process to become a firefighter/paramedic for Defendant.

36.   Plaintiff's lawsuit is not ripe as he was never rejected from the medical screening process. As such, Plaintiff's action is frivolous and Defendant is entitled to attorney fees and costs.

37.   Judgment is rendered in favor of Defendant.

## XI.   AMOUNT OF ASCERTAINABLE DAMAGES

A.   Plaintiff:

    (a)   Back pay from May 1, 2001 to August 15, 2005:

        Based on actual alternative employment (Raytown and NTA) - $71,513

        Based on continued employment at Raytown scenario - $44,295

    (b)   Front pay reduced to present value:

Based on current employment at NTA – $266,200

Based on continued employment at Raytown scenario – $142,619

(c)     Lost pension benefits reduced to present value:

Based on current employment at NTA – $147,702

Based on continued employment at Raytown scenario – $66,725

**Total lost remuneration reduced to present value**

Based on current employment at NTA – $485,415

Bases on continued employment at Raytown scenario – $253,666

B.     Defendant:     zero.

## XII.     ESTIMATE OF THE LENGTH OF TRIAL

The parties estimate that the trial will last approximately two (2) to three (3) days.  This case is set for trial to begin August 15, 2005.

## XIII.     ATTORNEYS INTERESTED IN THIS CASE

A.     Plaintiff:

Reva M. Kriegel (14930)
266 South Front Street, Suite 206
Memphis, Tennessee 38103
(901) 527-1319
(901) 529-9101 (fax)
A copy of the letterhead of Reva M. Kriegel is attached hereto as Exhibit "A."


THE DONATI LAW FIRM, LLP
Donald A. Donati (8633)
1545 Union Avenue
Memphis, Tennessee 38103
(901) 278-1004
(901) 278-3111 (fax)
A copy of the letterhead of The Donati Law Firm is attached hereto as Exhibit "B."

B.     Defendant:

Sara L. Hall, City Attorney
Elbert Jefferson, Jr., Deputy City Attorney
Chandell W. Ryan, Assistant City Attorney (021929)
125 North Main Street, Room 336
Memphis, Tennessee 38103
(901) 576.6614
(901) 576.6524 (fax)
A copy of the letterhead of The Donati Law Firm is attached hereto as Exhibit "C."

## XIV.   LIST OF SPECIAL EQUIPMENT

The Parties request no special equipment that is not already provided by the Court. However, Plaintiff may bring an overhead projector and/or computer lap top for presentation of certain exhibits and/or summations.

John Phipps McCalla
UNITED STATES DISTRICT JUDGE

Aug 5, 2005
DATE

APPROVED FOR ENTRY:


Reva M. Kriegel (14930)
266 South Front Street, Suite 206
Memphis, Tennessee 38103
(901) 527-1319
(901) 529-9101 (fax)



Chandell W. Ryan (TN BPR #021929)
Assistant City Attorney
City of Memphis
125 North Main Street, Room 314
Memphis, Tennessee 38103
Telephone: (901) 576-6614
Facsimile: (901) 576-6524
Attorneys for Defendant City of Memphis

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 122 in case 2:03-CV-02155 was distributed by fax, mail, or direct printing on August 8, 2005 to the parties listed.

Chandell W. Ryan
CITY ATTORNEY'S OFFICE
125 N. Main Street
Ste. 314
Memphis, TN 38103

Reva M. Kriegel
LAW OFFICE OF REVA M. KRIEGEL
266 S. Front St.
Ste. 206
Memphis, TN 38103

Elbert Jefferson
CITY ATTORNEY'S OFFICE
125 N. Main Street
Ste. 314
Memphis, TN 38103

Donald A. Donati
DONATI LAW FIRM, LLP
1545 Union Ave.
Memphis, TN 38104

Honorable Jon McCalla
US DISTRICT COURT